IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DOLORES A. ROMERO,

      Plaintiff,

v.                                              CIV 17-0373 JB/JHR

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      This matter comes before the Court on Plaintiff Dolores A. Romero's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing with Supporting Memorandum (*Doc. 20*), filed September 5, 2017. Pursuant to 28 U.S.C. § 636(b), this matter has been referred to me for a recommended disposition. *Doc. 22*. Having reviewed the parties' submissions, the relevant law, and the relevant portions of the Administrative Record, the Court recommends that Ms. Romero's Motion be denied.

## I.     INTRODUCTION

      Ms. Romero appeals the Social Security Administration's denial of her application for disability insurance benefits on numerous grounds. Most basically, she asserts that the administrative law judge ("ALJ") who denied her claim failed to weigh the evidence properly and failed to consider all of her limitations when formulating her residual functional capacity ("RFC"). *Doc. 20* at 1. She also argues that the ALJ failed to comply with the regulations in finding that she can return to her past relevant work. *Id.* However, for the reasons that follow, the undersigned finds that the ALJ's analysis is supported by law and substantial evidence. As such, the Court should affirm the ALJ's findings.

1

## II.     PROCEDURAL HISTORY

Ms. Romero filed an application with the Social Security Administration for disability insurance benefits under Title II of the Social Security Act on January 28, 2013, with a protective filing date of September 6, 2012. *AR* at 167, 190.[1] She alleged a disability onset date of November 10, 2011, the day she stopped working, due to severe central spinal canal stenosis at L3-L4. *AR* at 190, 204. Her application was denied initially and upon reconsideration. *AR* at 81-104. She requested review and, after holding a *de novo* hearing, ALJ Donna Montano issued an unfavorable decision on September 8, 2015. *AR* at 16-33. Ms. Romero requested that the Appeals Council review the ALJ's decision on September 24, 2015. *AR* at 7-15. The Appeals Council denied her request on February 9, 2017. *AR* at 1-6. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). This Court has jurisdiction to review the decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a).

A claimant seeking disability benefits must establish that she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[2]

---

[1] Documents 15-1 through 15-35 comprise the sealed Administrative Record ("*AR*"). The Court cites the Record's internal pagination, rather than the CM/ECF document number and page.

[2] The Tenth Circuit summarized these steps in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016):

> At step one, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). If not, the ALJ then decides whether the claimant has a medically severe impairment at step two. *Id.* If so, at step three, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the

At Step One of the process, the ALJ found that Ms. Romero has not engaged in substantial gainful activity during the relevant time period. *AR* at 21. At Step Two, she determined that Ms. Romero has the severe impairment of "status post lumbar spinal canal stenosis status post surgery in 2003 and decompression in November 2012, fibromyalgia, early osteoarthrosis of the left sacroiliac joint, osteopenia of the lumbar spine and femoral neck, and chronic pain syndrome. . . ." *AR* at 21. At Step Three, the ALJ concluded that Ms. Romero's impairments, individually and in combination, did not meet or medically equal the regulatory "listings." *AR* at 24.

When a claimant does not meet a listed impairment, the ALJ must determine her residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1; *see* 20 C.F.R. § 404.1545(a)(1). In this case, the ALJ determined that Ms. Romero retains the RFC to "perform the full range of light work as defined in 20 CFR 404.1567(b)." *AR* at 24. Employing this RFC at Step Four, the ALJ determined that Ms. Romero is able to perform her past relevant work as a gambling cashier, billing clerk, receptionist, customer service representative, and private-brank(sic)-exchange service adviser. *AR* at 28. Accordingly, the ALJ determined that Ms. Romero was not disabled from her alleged onset date through the date of her decision, and denied benefits. *AR* at 29.

---

relevant disability regulation.'" *Id.* (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). Absent a match in the listings, the ALJ must decide at step four whether the claimant's impairment prevents him from performing his past relevant work. *Id.* Even if so, the ALJ must determine at step five whether the claimant has the RFC to "perform other work in the national economy." *Id.*

## III. LEGAL STANDARD

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). The Court must "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation omitted). The Court reviews only the sufficiency of the evidence, not its weight. *Oldham v. Astrue*. 509 F.3d 1254, 1257 (10th Cir. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,] [and] requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084 (quotation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[.]" *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

## IV. ANALYSIS

Ms. Romero raises two main arguments with various associated sub arguments. First, she contends that the ALJ's RFC finding is unsupported by substantial evidence and is contrary to law. *Doc. 20* at 12. Specifically, Ms. Romero asserts that the ALJ committed error by adopting the non-examining doctors' findings that she is able to perform light work, by failing to include pain limitations in the RFC, by rejecting the opinion of her treating physician's assistant, by relying on improper factors when assessing her credibility, and by failing to utilize the proper structure when formulating her RFC. *See id.* at 12-21. Second, Ms. Romero asserts that the ALJ

committed legal error at step four, when she determined that Ms. Romero can perform her past work. *Doc. 20* at 21. Specifically, Ms. Romero argues that the ALJ erred at step four by failing include all of her limitations in the RFC, by failing to compare her RFC and the functions of her past work, and by failing to state whether she could return to the work as actually performed or as generally performed in the national economy. *Id.* at 21-25. Having carefully reviewed these arguments and record in this case, the Court concludes that the ALJ's findings are supported by law and substantial evidence.

A) <u>**The ALJ's RFC finding followed the applicable legal standards and is supported by substantial evidence.**</u>

As noted above, the ALJ found that Ms. Romero retains the RFC to perform a full range of light work as defined by the regulations. In reaching this finding, the ALJ relied on the findings of nonexamining doctors employed by the Commissioner and effectively rejected the opinion of Ms. Romero's treating physician's assistant. The ALJ also discounted Ms. Romero's allegations of disabling pain. Ms. Romero argues that some of these findings are contrary to law, and that they are all contrary to substantial evidence. The Court, however, disagrees.

1. **The ALJ permissibly adopted the non-examining doctors' findings that Ms. Romero is capable of light work.**

"Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a. Under 20 C.F.R. § 404.1527(c), an ALJ must consider the following factors in deciding the weight to give a medical opinion: (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the

record as a whole; (5) the source's specialization in the area opined to; and (6) "any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c)(1)-(6).

Here, the ALJ adopted the non-examining doctors' opinions because they "are consistent with the mild diagnostic and clinical findings and the conservative treatment records." *AR* at 28. The ALJ made this finding after discussing the legal standards, noted above, *AR* at 27, and after considering all of the medical evidence in the record. *AR* at 24-28. The Court will not disturb the ALJ's findings in this regard.

Ms. Romero, however, posits that the non-examining doctors' opinions were stale, and were post-dated by 200 pages of medical records. *Doc. 20* at 13-14 (citing *Chapo v. Astrue*, 682 F.3d 1285, 1292-93 (10th Cir. 2012)). While it is true that *Chapo* cautions that an ALJ should not rely on a "patently stale opinion" when formulating a claimant's RFC, *id.*, as the Commissioner argues, the Tenth Circuit has rejected this argument where nothing later in the record undermines the opinions. *Doc. 24* at 8 (citing *Tarpley v. Colvin*, 601 F. App'x 641, 644 (10th Cir. 2015)). In *Tarpley*, the Tenth Circuit affirmed an ALJ's reliance on a prior opinion even in the face of two more recent restrictive findings because nothing in the later medical records cited by the claimant supported the disabling limitations found by the other doctors or "a material change in [the claimant's] condition that would render [the prior opinion] stale." *Id.*

Of course, Ms. Romero attempts to distinguish *Tarpley* on the basis that her treating physician's assistant, Mr. Mamdani, recommended more severe restrictions than did the non-examining physicians. However, the ALJ effectively rejected the restrictions Mr. Mamdani opined to and, for the reasons stated below, the Court finds the ALJ's rejection of these restrictions to be supported by substantial evidence.

Finally, Ms. Romero argues that the ALJ's reasons for crediting the non-examining doctors' opinions were unsupported by substantial evidence because she does not have "mild diagnostic and clinical findings" or "conservative treatment records," she has had two spine surgeries and epidural injections. *Doc. 20* at 14 (citing *AR* at 383). To this point, the Commissioner responds that Ms. Romero's post-surgery treatment was conservative, and she improved post-surgery to the point that she could perform the demands of light work. *Doc. 24* at 9. For the reasons that follow, the Court agrees with the Commissioner.

While it is true that spinal surgeries cannot be considered "conservative" treatment, Ms. Romero's post-surgery treatment was unquestionably that. Ms. Romero underwent her second spinal surgery on November 12, 2012, after failing "conservative management" of her symptoms. *AR* at 383. The surgery was performed by Richard Castillo, M.D., who explained that the major goal of surgery was to try and help Ms. Romero's leg symptoms and "may or may not have much effect in her back discomfort." *AR* at 384. Ms. Romero presented for a post-operative visit on November 27, 2012, at which time she "state[d] that she is doing better since surgical intervention" and "experiencing minimal pain," rated at a 3/10. *AR* at 649. She was advised to follow up with Dr. Castillo in two months. *AR* at 650.

Ms. Romero presented for a post-operative appointment on January 10, 2013. *AR* at 643. She reported pain at a 7/10. *AR* at 643. Dr. Castillo advised Ms. Romero to continue to work on her home exercise program and she was advised to follow up in two months. *AR* at 643. Ms. Romero was then seen on February 7, 2013, complaining that she was still having pain despite surgical intervention, rated at a 9/10. *AR* at 656. Ms. Romero was encouraged to continue her postoperative exercise program, but it was noted that "her prognosis might be limited." *AR* at 656.

In the meantime, Ms. Romero was treated by Abdul Mamdani, PA-C. *See AR* at 673. On March 12, 2013, Ms. Romero presented for a scheduled appointment complaining of joint pain and bilateral knee pain lasting four weeks. *AR* at 673. Ms. Romero updated Mr. Mamdani about her back surgery and reported that "she is getting better." *AR* at 673. Mr. Mamdani noted that Ms. Romero was given narcotic pain medication to start, but was not currently on any narcotics, "only on baclofen."[3] *AR* at 673. In his findings, Mr. Mamdani noted that Ms. Romero had a normal gait, normal heel to toe walk, her knees were negative for varus and valgus testing,[4] and that Ms. Romero was "able to do flexion and extension of the lumbar spine with limited range of motion due to recent back surgery." *AR* at 674. Mr. Mamdani assessed chronic back and bilateral knee pain. *AR* at 674. He told Ms. Romero to return to the clinic in two to three months, started her on a trial of Celebrex,[5] and continued her gabapentin.[6]

Ms. Romero was then seen by Dr. Castillo on March 28, 2013. *AR* at 645. She reported a pain level of 3/10 as well as "a great deal of achiness." *Id.* She told Dr. Castillo that she was attending ordered therapy twice per week, and that her primary care provider had started her on Celebrex and gabapentin. *AR* at 645. Dr. Castillo advised Ms. Romero to continue to work on her exercise program, noting that he felt that "most of her symptoms are mechanical. Hopefully the

---

[3] "Baclofen is a muscle relaxer and an antispastic agent. Baclofen is used to treat muscle symptoms caused by multiple sclerosis, including spasm, pain, and stiffness. Baclofen is sometimes used to treat muscle spasms and other symptoms in people with injury or disease of the spinal cord." <https://www.drugs.com/baclofen.html> (accessed December 11, 2017).

[4] This testing assesses one-plane medial and lateral instability in the knee. *See* <http://www.pthaven.com/page/show/102192-valgus-and-varus-stress-test> (accessed December 11, 2017).

[5] "Celebrex (celecoxib) is a nonsteroidal anti-inflammatory drug (NSAID). Celecoxib works by reducing hormones that cause inflammation and pain in the body. Celebrex is used to treat pain or inflammation caused by many conditions such as arthritis, ankylosing spondylitis, and menstrual pain." <https://www.drugs.com/celebrex.html> (accessed December 11, 2017).

[6] "Gabapentin is an anti-epileptic drug, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. Gabapentin is used in adults to treat neuropathic pain (nerve pain) caused by herpes virus or shingles (herpes zoster)." <https://www.drugs.com/gabapentin.html> (accessed December 11, 2017).

exercise and Celebrex will be useful for that." *AR* at 646. As the ALJ noted, "[t]here are no subsequent orthopedic records after this date." *AR* at 25.

On May 6, 2013, Ms. Romero presented for a follow-up with Mr. Mamdani. *AR* at 669. She complained of joint pain, bilateral knee pains and popping in her left hip. *AR* at 669. Ms. Romero stated that the Celebrex she was given at her last visit did not help, and she rated her pain at a 9/10. *AR* at 669. Mr. Mamdani noted that Ms. Romero was "going through a process of disability and that they recommended that the patient needs to get other documentation about her joint pain as much as she can so she can (sic) a good case for a disability." *AR* at 669. Despite her complaints, Ms. Romero was not in apparent distress, her gait was normal, she had a normal heel to toe walk, her knees were negative for varus and valgus testing, and she had a full range of motion in her left hip. *AR* at 669-670. Mr. Mamdani assessed bilateral knee pain and left hip pain. *AR* at 670. He discontinued Celebrex and started a trial of Mobic,[7] and advised Ms. Romero to return to the clinic in 2-3 months. *AR* at 670, 705.

Ms. Romero next presented to Mr. Mamdani on August 26, 2013, "complaining of joint pain which has gotten worse for the past 2 weeks" and fatigue. *AR* at 702. Prior to the onset of this pain, Ms. Romero reported exercising daily and participating in water therapy twice a week. *AR* at 702. On examination, Mr. Mamdani noted a normal gait, normal heel to toe walk, negative varus and valgus testing on her bilateral knees, and "full range of motion of L spine and C spine." *AR* at 703. Mr. Mamdani assessed joint pain (arthralgia) and fatigue. *AR* at 703. He advised Ms. Romero to return to the clinic in two weeks, discontinued her Mobic, increased her

---

[7] "Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID). Meloxicam works by reducing hormones that cause inflammation and pain in the body. Mobic is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis in adults. Mobic is also used to treat juvenile rheumatoid arthritis in children who are at least 2 years old." <https://www.drugs.com/mobic.html>. (accessed December 11, 2017).

gabapentin, and started a trial of naproxen.[8] *AR* at 703. When Ms. Romero returned on

September 9, 2013, she reported that the naproxen helped with her pain, and Mr. Mamdani

assessed Osteopenia[9] per her Dual-energy X-ray absorptiometry (DEXA) report. *AR* at 700-701.

Mr. Mamdani refilled Ms. Romero's naproxen, continued her gabapentin, started a course of

calcium and vitamin D supplements, and advised Ms. Romero to return to the clinic in three

months. *AR* at 701.[10]

Ms. Romero returned to Mr. Mamdani on April 8, 2014, complaining of constant back

pain, beginning the day prior. *AR* at 825. She demonstrated tenderness in the paraspinous

muscles at L4-L5, S1 area bilaterally. *AR* at 825. However, on examination she had full range of

motion in her upper and lower extremities, L-spine and C-spine; her gait was normal, as was her

heel to toe walk. *AR* at 825. Ms. Romero reported that she had discontinued her baclofen, which

was reordered, and she was started on a trial of Voltaren topical. She also "was advised to

continue to do stretching exercises as she mentioned that she has been doing them. Also, she is

doing water therapy. We will go ahead and advise patient to continue to do that." *AR* at 826. Ms.

Romero was told to return to the clinic as needed. *AR* at 826.

In sum, there is nothing in Ms. Romero's post-surgery treatment records that undermines

the opinions of the state-agency doctors who determined that Plaintiff is able to perform the

requirements of light work. Rather, her post-surgery records show a general improvement in her

---

[8] "Naproxen is a nonsteroidal anti-inflammatory drug (NSAID). It works by reducing hormones that cause inflammation and pain in the body. Naproxen is used to treat pain or inflammation caused by conditions such as arthritis, ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps."
<https://www.drugs.com/naproxen.html> (accessed December 11, 2017).

[9] *See* Osteopenia: When you have weak bones, but not osteoporosis, Harvard Health Publishing (March 25, 2017), <https://www.health.harvard.edu/womens-health/osteopenia-when-you-have-weak-bones-but-not-osteoporosis> (accessed December 11, 2017).

[10] Ms. Romero did return to the clinic and hospital with various complaints over the course of 2013-14, but did not report back or knee pain as her chief complaint until April 8, 2014. *See AR* at 720-822.

symptoms to the point where she consistently demonstrated a normal gait, normal heel to toe walk, and a full range of motion in her spine. As such, the Court will not reverse the ALJ for relying on the opinions of the non-examining doctors.

### 2. The ALJ reasonably discounted Ms. Romero's complaints of pain, and was not required to include unsupported pain limitations in the RFC.

Citing various cases and administrative rulings, Ms. Romero posits that because she has been diagnosed with stenosis, degenerative disc disease and fibromyalgia, all of which are consistent with persistent complaints of pain, the ALJ erred in failing to include pain limitations in the RFC. *Doc. 20* at 14. The Commissioner responds that the ALJ reasonably found Ms. Romero's claims of disabling limitations to be unsupported by the record, *Doc. 24* at 10, and that diagnosis of a condition does not alone establish that it is disabling. *Doc. 24* at 11 n.3 (citing *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1998)). The Court agrees with the Commissioner.

This Court begins with the proposition that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3P, 2017 WL 5180304, *2. Additionally, "subjective symptom evaluation," formerly known as "[c]redibility[,][11] determinations are peculiarly the province of the finder of fact and will not be overturned when supported by substantial evidence." *Watts*, 2017 WL 4862424, at *3 (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010)). Still, under *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), and its progeny,

> the ALJ must consider and determine: (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether the impairment is reasonably expected to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain was in fact disabling.

---

[11] The Administration eliminated the use of the term "credibility" from its sub-regulatory policy for the purpose of clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3P, 2017 WL 5180304, *2.

*Brownrigg v. Berryhill*, 688 F. App'x 542, 545 (10th Cir. April 19, 2017) (quoting *Keyes-Zachary*, 695 F.3d at 1166-67). An ALJ is not required to cite to *Luna* if he states its paradigm. *Razo v. Colvin*, 663 F. App'x 710, 717 (10th Cir. 2016). Factors under the regulations relevant to the determination of whether a claimant's pain is in fact disabling include:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2017 WL 5180304, *7-8; *see Watts*, 2017 WL 4862424, at *3. Findings as to a claimant's subjective pain "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. . . . But we do not require a formalistic factor-by-factor recitation of the evidence." *Watts*, 2017 WL 4862424, at *3 (citing *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000)). To the contrary, an ALJ need only discuss those factors that are "relevant to the case." SSR 16-3P, 2017 WL 5180304, *8.

"Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities[.]" SSR 16-3P, 2017 WL 5180304, *5. That said, "we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.*

Rather, "if we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms." *Id.* at *6.

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities. . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities. . . .

*Id.* at *8. With these standards in mind, the Court turns to the specific arguments Ms. Romero raises in this case.

First, she posits that both stenosis and degenerative disc disease are consistent with persistent complaints of back pain. *Doc. 20* at 14 (citing *Hardman v. Barnhart*, 362 F.3d 676 (10th Cir. 2004)). *Hardman* held that an ALJ must give specific reasons that are closely and affirmatively linked to the evidence when making credibility findings. *Id.* at 681. There, the ALJ opined that the claimant's allegations were not fully credible due to a lack of objective findings, a lack of medication for severe pain, infrequent treatment, and the lack of physical discomfort shown by the claimant at the administrative hearing. *Id.* at 679. The Tenth Circuit held that these reasons were unsupported by substantial evidence. *Id.* at 680-81. Pertinent to this case, the court found unsupported the ALJ's finding that the claimant's objective medical tests showed no basis for his allegations of pain because a MRI showed that the claimant was suffering from degenerative disc disease and spinal stenosis, which the Tenth Circuit found "consistent with his persistent complaints of lower back pain[.]" *Id.* at 681.

*Hardman* does not apply here. Here, the ALJ described the medical evidence in the record. *AR* at 25-26. She then made the following findings related to Ms. Romero's pain:

> The above evidence suggests the claimant is not in disabling pain. The treatment records reveal [that] although the claimant has received treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Additionally, the lack of consistently abnormal physical examinations or even a referral to a specialist suggests the claimant's symptoms and limitations are not as severe as she alleged. Furthermore, a physician assistant primarily treated the claimant for her impairments. The fact that the severity of the claimant's impairments did not warrant treatment by a doctor or specialist diminishes the credibility of the claimant's allegations regarding the severity of her impairments. Based on the above evidence, restrictions were included in the residual functional capacity to accommodate reasonable symptoms, but the overall evidence does not support disabling limitations.

> The claimant has also described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Despite her impairments, the claimant has engaged in a somewhat normal level of daily activity and social interaction as fully detailed in Finding 3. Particularly, the claimant indicated she could complete self-care, leisure, and household tasks independently. Some of the physical and mental abilities required to perform these daily activities and social interactions are the same as those necessary for obtaining and maintaining employment. The claimant's ability to participate in such activities undermined the credibility of the claimant's allegations of disabling functional limitations.

*AR* at 26-27.

In sum, the ALJ followed the mandates of *Hardman*, and did not merely make conclusions in the guise of findings. Rather, she recognized that Ms. Romero is in pain, just not disabling pain. As discussed above, Ms. Romero's post-surgery treatment records are relatively benign, and it was within the ALJ's prerogative to determine that the lack of consistently abnormal physical examinations or referral to a specialist undermined Ms. Romero's complaints of disabling back pain. *See* 20 C.F.R. § 404.1529(c)(2) (Objective medical evidence … is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence

of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."). The ALJ also properly relied upon Ms. Romero's daily activities, which she determined reflect a "somewhat normal level of daily activity and social interaction." *AR* at 26; *see* 20 C.F.R. § 404.1529(c)(3)(i).

As to her fibromyalgia, Ms. Romero argues that the ALJ's reliance on the absence of "significant" findings was legal error. *Doc. 20* at 15 (citing *Moore v. Barnhart*, 114 F. App'x 983, 990-92 (10th Cir. 2004); SSR 12-2p). True, the Tenth Circuit has recognized that "[t]here are no laboratory tests for the presence or severity of fibromyalgia." *Moore v. Barnhart*, 114 F. App'x 983, 991 (10th Cir. 2004) (quotation omitted). In fact,

> [p]atients with FMS usually look healthy. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling, although there may be tenderness on palpation. In addition, muscle strength, sensory functions, and reflexes are normal despite the patient's complaints of acral numbness.

*Id.* (quotation omitted). Thus, an ALJ errs if she requires "objective *evidence* for a disease that eludes such measurement." *Id.* (citation omitted) (emphasis added).

However, this does not mean that there are no objective *findings* related to the disease, as "objective medical evidence of fibromyalgia includes consistent trigger-point findings." *Moore*, 114 F. App'x at 991 (citation omitted). "Likewise, although the existence of severity of fibromyalgia may not be determinable by objective medical tests, [the Tenth Circuit] has suggested that the physical limitations imposed by the condition's symptoms can be objectively analyzed." *Tarpley*, 601 F. App'x at 643 (citations omitted); *see also* SSR 12-2P, 2012 WL 3104869 at *2 ("As with any claim for disability benefits, before we find that a person with an MDI of FM is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."). "For a person with FM, we will consider

a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2P, 2012 WL 3104869 at *6. "If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-2P, 2012 WL 3104869 at *5.

The ALJ stated the following with regard to Ms. Romero's fibromyalgia:

> Prior to the alleged onset date, the claimant has a history of fatigue and back pain complaints (*See generally* Exhibit 1F). She was diagnosed with fibromyalgia in August of 2011 and started a series of medications *(E.g.* Exhibit 1F, pp. 58-59; Exhibit 7F, p. 10; and Hearing Testimony). In her visits with Mr. Mamdani, the claimant reported joint pain and fatigue but her physical examinations were unremarkable. She was only prescribed conservative treatment such as medication where her neurological examinations were consistently normal as well. Overall, the records also showed that the effects for medication were usually noted, addressed, and modified, if needed (Exhibit 12F, pp. 10-58). Notably, she has not been referred to a specialist for this impairment.

*AR* at 26.

In other words, the ALJ followed *Tarpley* and SSR 12-2P by objectively analyzing the physical limitations stemming from Ms. Romero's fibromyalgia and ultimately determining that the objective evidence was insufficient to support a finding that Ms. Romero's symptoms preclude her from working. Moreover, directly after discussing Ms. Romero's medical records related to her back pain and fibromyalgia, the ALJ analyzed her pain, and, as noted above, ultimately reached the conclusion that "[t]he above evidence suggests the claimant is not in disabling pain." *AR* at 26. Thus, the ALJ turned to other evidence in the record, like Ms.

Romero's daily activities, and ultimately concluded that Ms. Romero's fibromyalgia symptoms are not disabling. The Court will not disrupt this finding.

### 3. The ALJ relied upon appropriate factors in assessing Ms. Romero's credibility.

In an argument related to her credibility, Ms. Romero argues that the ALJ relied on "improper" factors when determining that Ms. Romero retains the RFC to perform light work. *Doc. 20* at 17-21. As set forth above, in making this finding the ALJ relied on Ms. Romero's conservative treatment, including the fact that she was treated by a physician's assistant rather than a physician or specialist, and daily activities. *AR* at 25, 26, 28. The ALJ also discounted Ms. Romero's credibility on the basis of inconsistencies between her function reports. *AR* at 23. Having reviewed the record, the Court finds little fault with the ALJ's analysis.

First, Ms. Romero contends that the ALJ's characterization of her treatment (as conservative) was error. *Doc. 20* at 18. The Court agrees that back surgery is not "conservative" treatment. *See Alarid v. Colvin*, 590 F. App'x 789, 794 (10th Cir. 2014). However, as discussed above, and as argued by the Commissioner, Ms. Romero's *post*-surgery treatment was in fact conservative. *Doc. 24* at 10-11. Therefore, the ALJ did not err in relying on Ms. Romero's conservative treatment in discounting her credibility as to her overall level of regular and continuing pain. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (affirming an ALJ's finding that the claimant had responded to conservative treatment for pain).

Second, Ms. Romero argues that her daily activities are not as robust as the ALJ described. *Doc. 20* at 18. The Commissioner, on the other hand, argues that the ALJ reasonably relied on Ms. Romero's daily activities in discounting her complaints of pain. *Doc. 24* at 11 (citing *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010)). Certainly, the ALJ was permitted to rely on Ms. Romero's daily activities when assessing her credibility. *See, e.g.*,

*Wilson*, 602 F.3d at 1146. The question is whether the ALJ's findings as to those daily activities were supported by substantial evidence. The Court finds that they were.

When formulating her RFC, the ALJ found that Ms. Romero "described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Despite her impairments the claimant has engaged in a somewhat normal level of daily activity and social interaction as fully detailed in Finding 3." *AR* at 26. In Finding 3, the ALJ stated the following with regard to Ms. Romero's daily activities and social interaction:

> The first functional area is activities of daily living. In this area, the claimant has mild limitation. She testified she does some house duties such as dusting, folding clothes, washing dishes, and light cooking. In an initial adult function report dated April 7, 2013, the claimant reported she is able to make coffee, make breakfast, take a short walk, go to water therapy or the fitness center, and use the computer. She also indicated she has no problems with personal care and can prepare her own meals (Exhibit 6E, pp. 1-3). She further acknowledged she is able to drive a car, shop in stores, and camp and fish in the summer (Exhibit 6E, pp. 4-5). The claimant's ability to perform the above daily activities independently supports the finding of mild restrictions. The undersigned notes that the claimant attempted to minimize her daily activities in another adult function report dated September 24, 2013 which was completed by Joseph Baca, an employee with the claimant's attorney (Exhibit 11E). The degree of self-asserted limitations is not supported by the objective medical evidence described in Finding 5 below and vastly inconsistent with her prior statements, which indicates an attempt by the claimant to exaggerate the severity of her symptoms.
>
> The next functional area is social functioning. In this area, the claimant has mild limitation. She indicated she goes out to eat with her husband (Exhibit 6E, p. 1). She also reported she visits with her family and friends at their homes and by phone and expressed liking to go out to dinner. The claimant further stated she enjoys watching her grandchildren play sports and goes to church, the fitness center, and water therapy on a regular basis (Exhibit 6E, p. 5). The claimant's ability to socialize adequately with family and others supports the finding of mild restrictions.

*AR* at 23.

The Court has reviewed Ms. Romero's function reports, and cannot disagree with the ALJ's assessment that Ms. Romero appears to have attempted to minimize her daily activities in

her second report. *Compare AR* at 222-229 *with AR* at 241-248. Ms. Romero initially reported that she performs relatively normal daily activities with the caveat that she is not able to sit or stand for long periods; she takes care of her personal care without assistance; cooks; cleans with breaks; drives a car; shops in stores; camps and fishes during the summer; visits with family and friends; and attends church, water therapy, and a fitness center. *AR* at 222-229. In contrast, in her second function report Ms. Romero reports severe pain with all activities, difficulty performing personal care, an inability to prepare her own meals, the inability to complete all but "extremely light chores," difficulty driving, the complete inability to engage in her hobbies, difficulties with social activities, and the inability to go anywhere but to Sunday Mass. *AR* at 241-248. Thus, the ALJ was not wrong to devalue Ms. Romero's credibility on the basis of inconsistencies in her function reports. *See Vigil v. Colvin*, 623 F. App'x 936, 939 (10th Cir. 2015) ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.") (citing SSR 96–7p, at *5). Moreover, contrary to Ms. Romero's argument that the ALJ "did not provide an accurate portrayal of just how limited Ms. Romero is," *Doc. 25* at 4, the ALJ's findings as to her daily activities are supported by substantial evidence.

Finally, Ms. Romero argues that it was legal error for the ALJ to discount her credibility on the basis that she was being treated by a physician's assistant rather than a doctor or specialist. *Doc. 20* at 21 (citing *Frantz v. Astrue*, 509 F.3d 1299, 1301-02 (10th Cir. 2007)). Even assuming for the sake of argument that this reason was improper, the Court has already found that the ALJ's other reasons are supported by substantial evidence. Therefore, it will not reverse the ALJ's credibility or RFC finding on this ground. *See, e.g.*, *Butler v. Astrue*, 410 F. App'x 137, 139 (10th Cir. 2011) ("[W]e need not address this issue, because the ALJ's other reasons

provide substantial evidence to support the credibility determination."); *Pickup v. Colvin*, 606 F. App'x 430, 432 (10th Cir. 2015) ("Although we agree with the district court that two aspects of the ALJ's credibility determination are mistaken, 'we conclude that the balance of the ALJ's credibility analysis is supported by substantial evidence in the record.'") (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004)).

In sum, after examining the record as a whole, the Court is "persuaded that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence. Plaintiff's argument to the contrary constitutes an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute [my] judgment for that of the Commissioner, an invitation [the Court] must decline." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

### 4. The ALJ permissibly rejected the opinions of Abdul Mamdani, PA-C that Ms. Romero is unable to work.

As noted, in determining that Ms. Romero is capable of performing light work, the ALJ effectively rejected the opinions of Ms. Romero's treating physician's assistant, Abdul Mamdani. *See AR* at 27 (assigning "little weight" to Mr. Mamdani's opinion); *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight to" an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (citing *Chapo* for this proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (same). Ms. Romero argues that the ALJ erred in her treatment of Mr. Mamdani's opinion. *Doc. 20* at 16. The Commissioner counters that the ALJ reasonably weighed and discounted Mr. Mamdani's opinion under the pertinent regulations. *Doc. 24* at 9. The Court agrees with the Commissioner.

"It is the ALJ's duty to give consideration to all the medical opinions in the record. . . . He must also discuss the weight he assigns to such opinions." *Keyes-Zachary*, 695 F.3d at 1161 (cited regulations omitted). However, there is a distinction in the regulations between

"acceptable" medical sources and those that are not. *See* SSR 06-03p, 2006 WL 2329939 at *2. "'Acceptable medical sources' include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists." *Id.* Any other medical provider is referred to as an "other source." *Id.* The distinction is "necessary" because only "acceptable medical sources" can "establish the existence of a medically determinable impairment," give "medical opinions,"[12] and be considered "treating sources[13] . . . whose medical opinions may be entitled to controlling weight." *Id.* This is not to say that "other sources" are unimportant. To the contrary, as the Commissioner recognized when promulgating SSR 06-03p: "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources' . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 232939 at *3. As such, while information from "other sources" "cannot establish the existence of a medically determinable impairment . . . information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2; *see also Carpenter v. Astrue*, 537 F.3d 1264, 1267-68 (10th Cir. 2008) (explaining that while "other sources" cannot *diagnose* an impairment, their opinions are relevant to "the questions of *severity* and *functionality*") (citing *Frantz v. Astrue*, 509 F.3d 1299, 1301-02 (10th Cir. 2007)): *See also Mounts v. Astrue*, 479 F.

---

[12] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

[13] "Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2).

App'x 860, 865 (10th Cir. 2012) (Other source "evidence can be considered to show the severity of a claimant's impairment and how it affects her ability to work.").

Medical evidence and opinions from "other sources" are weighed using the factors stated in 20 C.F.R. §§ 404.1527(c)(1) through (c)(6). *See* 20 C.F.R. § 404.1527(f)(1). These factors include: (1) the examining relationship; (2) the treatment relationship; (3) supportability of the opinion; (4) consistency of the medical opinion with the record as a whole; (5) specialization; and, (6) any "other factors" "which tend to support or contradict the medical opinion." 20 C.F.R. §§ 404.1527(c)(1)-(6); *see also Crowder v. Colvin*, 561 F. App'x 740, 744 (10th Cir. 2014). "[N]ot every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source . . . depends on the particular facts in each case." 20 C.F.R. § 404.1527(f)(1); *see also* SSR 06-03p, 2006 WL 2329939 at *4. Ultimately, "[i]n the case of a nonacceptable medical source like [Mr. Mamdani], the ALJ's decision is sufficient if it permits us to 'follow the adjudicator's reasoning.'" *Paulsen v. Colvin*, 665 F. App'x 660, 666 (10th Cir. 2016) (quoting *Keyes-Zachary*, 695 F.3d at 1164, in turn quoting SSR 06-03p, 2006 WL 2329939 at *6). With these standards in mind, the Court turns to the facts of this case.

On April 22, 2015, Mr. Mamdani opined that Ms. Romero cannot work due to pain resulting from her fibromyalgia, chronic back pain, bilateral knee pain from osteoarthritis, GERD, anxiety, depression, ear pain and headaches. *AR* at 907. MR. Mamdani further opined that Ms. Romero cannot sit, stand or walk for long periods of time due to pain, and cannot lift more than 10 pounds. *AR* at 907. The ALJ gave

> little weight to Mr. Mamdani's assessment, as the opinions expressed are quite conclusory, providing very little explanation of the evidence relied on in forming those opinions. Mr. Mamdani did not document positive objective clinical or diagnostic findings to support his assessment. In addition, Mr. Mamdani's

statements are unsupported by the claimant's clinical findings and her conservative treatment; thus his opinions are rendered less persuasive. Moreover, his opinions are also overly vague and do not give specific work limitations. These opinions also (sic) not from an acceptable medical source so the undersigned gives them less weight than other qualifying medical source opinions.

Furthermore, due to the absence of objective supportive evidence, it seems Mr. Mamdani apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The possibility also exists that a treating source may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. For these reasons, I give little weight to Mr. Mamdani's opinion.

*AR* at 27. As noted above, most of these reasons are facially valid under the regulations. 20 C.F.R. § 404.1527(c)(1)-(6), and having reviewed Mr. Mamdani's records, the Court does not fault the ALJ for reaching the conclusion that his opinions were unsupported by "positive clinical or diagnostic findings." *AR* at 27.

Ms. Romero argues that *none* of the ALJ's reasons for discounting Mr. Mamdani's opinions are supported by the evidence because Ms. Romero has been diagnosed with stenosis, chronic pain syndrome and fibromyalgia, all of which are consistent with limitations from pain. *Doc. 20* at 16. However, having reviewed Mr. Mamdani's treatment notes, it is unclear how they support a finding that Ms. Romero is completely disabled from all work. In her Reply, Ms. Romero argues that her mere diagnoses of fibromyalgia, stenosis and osteopenia render Mr. Mamdani's opinion consistent with the clinical findings, *Doc. 25* at 3, but, as noted above, the mere diagnosis of a condition does not automatically render a claimant disabled. *See Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). Thus, while the Court agrees with Ms. Romero in

principle that her conditions are consistent with limitations from pain, the ALJ did not err in rejecting Mr. Mamdani's assessment that pain precludes her from all work.

The ALJ also permissibly relied upon Mr. Mamdani's specialty (or lack thereof) by noting that he is not an acceptable medical source. Ms. Romero argues that it makes no difference that Mr. Mamdani is a non-acceptable medical source, because in some cases the opinion of a non-acceptable medical source may outweigh one that is. *Doc. 25* at 3 (citing *Bowman v. Astrue*, 511 F.3d 1270, 1275 n.2 (10th Cir. 2008); *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007)). The Court agrees that "depending on the particular facts in a case . . . an opinion from a medical source that is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source[.]'" *Frantz*, 509 F.3d at 1302 (citing SSR06-03P at *5). However, this determination can be made only "after applying the factors for weighing opinion evidence" *id.*, set forth above. In this case, the ALJ permissibly found that Mr. Mamdani's opinions were entitled to little weight, and Plaintiff has identified no acceptable medical source whose opinion conflicts with the ALJ's findings. Moreover, as the Commissioner recognizes, Mr. Mamdani's opinion that Plaintiff cannot work is an issue reserved to the Commissioner. *Doc. 24* at 9 (citing *Castellano v. Sec'y of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)). As the Tenth Circuit recognized in *Castellano*, "final responsibility for determining the ultimate issue of disability is reserved to the Commissioner." *Paulsen v. Colvin*, 665 Fed. Appx. 660, 667 (10th Cir. 2016) (quoting *Castellano*); *see also* 20 C.F.R. § 404.1527(d)(2). As such, the administration "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *Id.* at § 404.1527(d)(3).

Ms. Romero also posits that the ALJ's intimation that Mr. Mamdani was advocating for Ms. Romero is unsupported by evidence, and that an ALJ cannot reject a treating medical source

due to its advocacy posture. *Doc. 20* at 17 (citing *McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002)). The *McGoffin* court recognized that "[w]e held years ago that an ALJ's assertion that a family doctor naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician." *McGoffin*, 288 F.3d at 1253. Putting aside the fact that Mr. Mamdani is not a "treating physician" under the regulations, the Court agrees with Ms. Romero that the ALJ fails to cite any evidence in support of this assertion.

However, in response, the Commissioner argues that the ALJ reasonably found that Ms. Romero's statements regarding the limiting effects of her impairments were not credible, and Mr. Mamdani appeared to rely on her subjective complaints because his examination findings did not match his opinion. *Doc. 24* at 10 (citing *Rivera v. Colvin*, 629 F. App'x 842, 845 (10th Cir. 2015)). The Commissioner's point is well-taken. Since *McGoffin*, the Tenth Circuit has clarified that that it is not error for an ALJ to reject a treating source's opinion on the ground that the source relied on the claimant's subjective complaints where the ALJ has found the claimant's allegations to be less than fully credible. *See Boucher v. Astrue*, 371 F. App'x 917, 923-924 (10th Cir. 2010) ("Here, the ALJ conducted a proper credibility analysis and reached a permissible conclusion that the claimant was less than fully credible. It was not error for the ALJ to then use this conclusion as one factor among several in reaching a secondary finding that Dr. Kass's opinion should be given less than controlling weight."); *see also Rivera*, 629 F. App'x at 845 ("In weighing their opinions, it was entirely appropriate for the ALJ to consider where [the medical sources] got their information."). Here, the ALJ found that Mr. Mamdani's opinion departed significantly from the objective evidence of record, and was likely based on Ms. Romero's subjective complaints, which the ALJ found less than fully credible. *AR* at 27. These were proper conclusions, based on substantial evidence.

**5. Any error resulting from the structure of the ALJ's RFC finding is harmless.**

Relying on SSR 96-8p, Ms. Romero next asserts that the ALJ's RFC was structurally inadequate. *Doc. 20* at 17. Specifically, she argues that the ALJ's RFC is not in the proper form because it failed to identify Ms. Romero's work-related abilities on a function-by-function basis. *Doc. 20* at 17.

In the past, strict adherence to SSR 96-8p's requirement of a function-by-function analysis in determining the RFC provided the reviewing court with a well-established and straightforward method for assessing whether the RFC was based on substantial evidence and if it supported the ALJ's conclusions as to the level of work, if any, the claimant could undertake. "The concern [was] that, without a function-by-function analysis, an ALJ 'may . . . overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do.'" SSR 96-8p, 1996 WL 374184, at *4. Thus, in the absence of a mandatory and proper function-by-function analysis, the case was automatically remanded for the ALJ to perform that necessary assessment. *See, e.g.*, *Southard v. Barnhart*, 72 F. App'x 781, 784 (10th Cir. 2003).

However, relatively recent precedent makes clear that the omission of the formulaic, function-by-function, analysis set forth in SSR 96-8p is harmless so long as the ALJ's decision discusses and addresses any pertinent limitations and is otherwise supported by substantial evidence. *See Hendron v. Collvin*, 767 F.3d 951, 954-7 (10th Cir. 2014) ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal."). When compared with the regulatory definition of light work, the ALJ's formulation of Plaintiff's RFC in this case accounts for all supported limitations by reference to

evidence of record. Accordingly, the Court finds that any structural error in the analysis is harmless. *Id.* at 957.

"RFC determines a work capability that is exertionally sufficient to allow performance of at least substantially all of the activities of work at a particular level." SSR 83-10, 1983 WL 31251 at *2. It is a reflection of "the maximum amount of each work-related activity the individual can perform," and, in reaching it, an ALJ must describe the "individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *7. Ordinarily, an ALJ may not simply express an RFC in terms of the exertional categories of "sedentary," "light," "medium" or "heavy" levels of work. Rather, in order to ensure accuracy, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the "seven strength demands" of sitting, standing, walking, lifting, carrying, pushing and pulling. *Id.* at *1, 5; (citing 20 C.F.R. §§ 404.1545, 416.945). However, "RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy." *Id.* at *3. Moreover, the Tenth Circuit has made clear that an ALJ's omission of this formulaic analysis is harmless so long as it is apparent that the ALJ considered the applicable strength demands. *See Hendron* 767 F.3d at 957.

In *Hendron* the plaintiff argued that the ALJ's omission of the function-by-function assessment resulted in his omission of her inability to sit for six hours during an eight-hour workday when formulating her RFC. *Id.* at 956. Had the ALJ engaged in the proper analysis, she argued, he would have not found that she retained the capacity to perform a full-range of sedentary work. *Id.* The Tenth Circuit acknowledged the importance of a formal articulation of

an applicant's strength demands in some cases. *Id.* (discussing SSR 96-8p, 1996 WL 374184 at *3). The court concluded, however, that the omission was harmless in Ms. Hendron's case because the ALJ considered the medical evidence she relied on and discounted it, noting that the records revealed that the plaintiff reported being "pain free" during the relevant time period. *Id.* at 957. The Tenth Circuit compared the ALJ's findings with the regulatory definition of sedentary work and concluded that the ALJ's RFC analysis sufficiently captured the plaintiff's ability to sit, because, although it was presented in narrative form, it demonstrated that "the ALJ did not overlook [the plaintiff's] problems with sitting; [but, rather] he found that the evidence did not support any limitation on her ability to sit. . . ." *Id.* As such, "the ALJ's failure to find explicitly that Ms. Hendron was capable of sitting for six hours during a regular eight-hour work day was not critical to the outcome of [that] case," *id.*, and the "ALJ's failure to perform [an] explicit function-by-function analysis was not error where the ALJ did not overlook limitations or restrictions pertinent to the work the claimant could do." *Patterson v. Colvin*, 662 F. App'x 634, 639 (10th Cir. 2016) (citing *Hendron*, 767 F.3d at 956–57). The ALJ's analysis in this case is analogous.

Here, the ALJ recognized Ms. Romero's testimony that "[f]unctionally, she stated she cannot sit or stand for long periods. She asserted [she] could only walk three blocks and lift no more than 10 pounds." *AR* at 25. The ALJ then reviewed the medical evidence, finding that "[b]ased on the above evidence, restrictions were included in the residual functional capacity to accommodate reasonable symptoms, but the overall evidence does not support disabling limitations." *AR* at 26. Accordingly, the ALJ determined that Ms. Romero retains the RFC to perform "the full range of light work as defined in 20 CFR 404.1567(b)." *AR* at 24. In so deciding, the ALJ necessarily found that Ms. Romero can perform all of the requirements of light

and sedentary work. 20 C.F.R. § 404.1567(b). Thus, as in *Hendron*, the Court is able to follow the ALJ's reasoning for not including sitting restrictions in the RFC. *See, e.g.*, *Aguilar v. Berryhill*, 2017 WL 1380643, at *6 (D.N.M. Mar. 31, 2017). And, critically, Ms. Romero points to no medical evidence that was not considered by the ALJ supporting the notion that she is unable to perform the exertional requirements of light work. *See Hendron*, 767 F.3d at 957. As such, the Court will not reverse the ALJ for her failure to properly formulate Ms. Romero's RFC.

**B.**    **The ALJ engaged in a proper analysis at step four.**

Having determined that the ALJ's RFC is supported by substantial evidence, the Court turns to Ms. Romero's contention that the ALJ committed legal error at step four, when she determined that Ms. Romero can perform her past work. *Doc. 20* at 21. At step four, the Commissioner employs the claimant's RFC to determine if she can still perform her past relevant work. 20 C.F.R. § 404.1520(e). Under the regulations:

> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment, which we made under paragraph (e) of this section, with the physical and mental demands of your past relevant work. . . . If you can still do this kind of work, we will find that you are not disabled.

20 C.F.R. § 404.1520(f).

Ms. Romero raises three arguments related to the ALJ's step four findings. First, Ms. Romero argues that "the RFC finding failed to include all limitations that are supported by the evidence." *Doc. 20* at 22 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996)). Second, she argues that the ALJ failed to compare her RFC with the functions of her past work. *Doc. 20* at 22. Finally, she argues that "the ALJ failed to state whether Ms. Romero could return to the work as actually performed, or as generally performed in the national economy." *Doc. 20* at 23. The Court rejects each of these arguments.

1. **The ALJ's RFC finding correctly included only those limitations that she found to be supported by substantial evidence.**

As to Ms. Romero's first argument, the Court has already determined that the ALJ's RFC is supported by substantial evidence. As such, it rejects the notion that the "ALJ failed to include limitations on Ms. Romero's ability to stand, walk and sit for prolonged periods." *Doc. 20* at 22. Rather, as the Commissioner correctly argues, "the ALJ was only required to include the limitations that were supported by the record and incorporated into the residual functional capacity assessment in her questions to the vocational expert." *Doc. 24* at 13 (citing *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) ("The hypothetical question should include all – and only – those impairments borne out by the evidentiary record. . . . The ALJ was not required to accept the answer to a hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record.")).

2. **The ALJ properly relied on VE testimony to identify the demands of Ms. Romero's past work.**

Relying on *Villalobos v. Colvin*, 44 F. App'x 793, 797 (10th Cir. 2013), and *Doyal v. Barnhart*, 331 F.3d 758, 760-761 (10th Cir. 2003), Ms. Romero argues that the ALJ committed reversible error by failing to inquire into the physical and mental demands of her past jobs when she determined that Ms. Romero is "capable of performing her past relevant work." *AR* at 28; *see Doc. 20* at 22.  Under the regulations:

> If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment, which we made under paragraph (e) of this section, with the physical and mental demands of your past relevant work. See paragraph (h) of this section and § 404.1560(b). If you can still do this kind of work, we will find that you are not disabled.

20 C.F.R. § 404.1520(f). The Tenth Circuit has summarized this process as "the three phases of evaluation the ALJ must complete as part of step four of the sequential analysis." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). As summarized in *Doyal*:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Id.* (quoting *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996)).

As noted, Ms. Romero's argument targets the second phase of this analysis, wherein the ALJ "must obtain factual information about those work demands which have a bearing on the medically established limitations." *Winfrey*, 92 F.3d at 1024 (quotation omitted). In essence, she argues that "the ALJ's adoption of the VE testimony was the equivalent of the ALJ allowing the VE to make the step four finding." *Doc. 20* at 23. Unfortunately for her, Ms. Romero's argument was rejected by the Tenth Circuit in one of the cases she cites in support of her position, *Doyal v. Barnhart*, 331 F.3d 758, 760-761 (10th Cir. 2003).

The *Doyal* claimant made the same argument as Ms. Romero: targeting "the alleged failure to make specific findings concerning [the demands of her past relevant work]." *Id.* at 760. There, as here, the ALJ did not make specific findings concerning the demands of the claimant's past relevant work. *Id.* Instead, the ALJ restated the Vocational Expert's testimony classifying the claimant's past relevant work. *Id.* "Ms. Doyal complain[ed] that the ALJ simply relied on the opinion of the vocational expert (VE) as to the demands of her past relevant work, without making the proper findings required by the remaining phases of the analysis." *Id.* at 761. In addressing this contention, the court noted, as does Ms. Romero, that "[i]t is improper for an ALJ to make RFC findings and then to delegate the remaining phases of the step four analysis to the

vocational expert, because in such cases, 'the remainder of the step four assessment takes place in the VE's head' and 'we are left with nothing to review.'" *Id.* (quoting *Winfrey*, 92 F.3d at 1023). However, the court recognized "[t]hat is not what occurred here[.]" *Id.* Rather, the ALJ simply "quoted the VE's testimony approvingly, in support of his own findings at phases two and three of the analysis." *Id.* Citing *Winfrey*, the court held that "[t]here was nothing improper about this . . . . [as a]n ALJ may rely on information supplied by the VE at step four." *Id.*

The ALJ followed the same process here by citing the VE's classification of Ms. Romero's past relevant work as it is described in the Dictionary of Occupational Titles. *Compare AR* at 28 *with AR* at 71-72. This was proper under *Doyal* and the regulations. In fact, under the regulations,

> [a] vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. . . . In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560(b)(2). And "it is well established that the agency accepts the definitions in the Dictionary of Occupational Titles (4th ed.1991) as reliable evidence at step four of the functional demands and job duties of a claimant's past job as it is usually performed in the national economy." *McAnally v. Astrue*, 241 F. App'x 515, 520 (10th Cir. 2007) (quoting *Haddock v. Apfel*, 196 F.3d 1084, 1090 (10th Cir.1999)).

The *Villalobos* case upon which Ms. Romero relies is not to the contrary. There, the ALJ completely omitted the second phase of step four, instead merely noting the VE's testimony that the claimant could perform his past jobs and stating that he could perform his past jobs as they

had actually been performed. *Villalobos*, 544 F. App'x at 797. Here, on the other hand, the ALJ explicitly noted Ms. Romero's past work "as generally performed pursuant to the DOT and as performed by the claimant." *AR* at 28. Thus, *Villalobos* is inapposite.

In sum, the Court will not reverse the ALJ for relying on the testimony of the VE when determining the demands of Ms. Romero's past relevant work, thereby following what appears to be standard practice in this circuit. *See, e.g. Bowman v. Astrue*, 511 F.3d 1270, 1273 (10th Cir. 2008) ("After the VE identified the appropriate DOT codes for [the claimant's] prior jobs, the ALJ could have taken administrative notice of this job information. . . ."); *Doyal*, 331 F.3d at 761 ("The ALJ did not delegate the analysis to the vocational expert; instead, he quoted the VE's testimony approvingly, in support of his own findings at phases two and three of the analysis. There was nothing improper about this.").

### 3. The ALJ permissibly found that Ms. Romero can return to her previous jobs both as they are generally performed and as she actually performed them.

Finally, Ms. Romero argues that "the ALJ failed to state whether Ms. Romero could return to the work as actually performed, or as generally performed in the national economy." *Doc. 20 at 23* (citing SSR 82-61). There is no merit to Ms. Romero's argument. After summarizing the VE's testimony as to Ms. Romero's past work "as generally performed pursuant to the DOT and as performed by the claimant" (which was, in turn, based on Ms. Romero's testimony and review of the record), the ALJ stated: "In comparing the claimant's residual functional capacity with the physical and mental demands of this past relevant work, the undersigned has determined the claimant is able to perform such work based on the testimony of the vocational expert." *AR* at 28-29. In other words, the ALJ found that Ms. Romero can perform her past relevant work both as she did perform it, and as generally required by employers throughout the national economy.

Moreover, Ms. Romero's reliance on SSR 82-61 is misplaced. Under that ruling,

> a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform: 1. The actual functional demands and job duties of a particular past relevant job; *or* 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

SSR 82-61, 1982 WL 31387 (emphasis added). Thus, the Commissioner is correct that under binding Tenth Circuit law, "the question at step four is whether a claimant can perform her past work *either* as it was actually performed *or* as it was generally performed, making the distinction irrelevant." *Doc. 24* at 14 (citing *Andrade v. Sec's of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993)). Under *Andrade*, the "claimant bears the burden of proving his inability to return to his particular former job *and* to his former occupation as that occupation is generally performed throughout the national economy." *Andrade*, 985 F.2d at 1051 (emphasis added). Thus, the ALJ was only required to find that Ms. Romero can return to her previous occupations as they are generally performed throughout the national economy. This occurred. *AR* at 28-29.

Finally, even if *Andrade* was not determinative, as Ms. Romero properly concedes, "there is case law holding that where the only RFC restriction was for a full range of light work, extensive inquiry into the demands of past work is not required." *Doc. 20* at 24 (citing *Burk v. Astrue*, 493 F. App'x 913 (10th Cir. 2012)). Ms. Romero attempts to distinguish *Burk* on the basis that, there, "the court noted that the doctors never mentioned any functional limitations related to her cervical and lumbar impairments[,]" *id.* whereas, here, "[i]n contrast . . . Ms. Romero has shown that the RFC finding for a full range of light work is underinclusive[.]" *Doc. 20* at 25. However, the Court has already found that the ALJ's RFC finding was supported by substantial evidence and Ms. Romero points to no evidence that has not already been addressed in this decision indicating that she is more restricted than the ALJ found. Moreover, the Tenth

Circuit's focus in *Burke* was on the RFC as found by the ALJ, not as the claimant would have had it. *See id.* at 917.

## V.    CONCLUSION

In sum, Ms. Romero has failed to demonstrate that the ALJ committed harmful, reversible, error in this case.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to remand (*Doc. 20*) be **denied**.


_____

UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).

**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**